IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF THE SEARCH OF:   )
                                  )      Magistrate No.
One (1) 2008 Kenworth T2000 tractor )
truck (black in color, bearing    )      13-174M
AZ Registration AE-68242)         )


IN THE MATTER OF THE SEARCH OF:   )
                                  )      Magistrate No.
one (1) Dane refrigeration trailer )
(white in color, bearing          )      13-175M
AZ Registration TB0433)           )

**AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT**

I, Special Agent Barry Baldwin, Drug Enforcement Administration, being duly sworn, depose and say:

1. I am a Special Agent of the Drug Enforcement Administration (DEA), United States Department of Justice (USDOJ). As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and make arrests for offenses enumerated in Title 18, United States Code, Section 251.

2. Your affiant has been employed as a DEA Special Agent since 1990. Your affiant has personally conducted and participated in numerous federal drug trafficking investigations of individuals engaged in the illegal distribution of controlled dangerous substances. In addition, your affiant has been involved in the

-1-

execution of numerous search and seizure warrants, made arrests for violations of state and federal laws, and authored supporting affidavits.

3. In connection with my work with the DEA, I have worked with federal, state, and local law enforcement officers in the Western District of Pennsylvania. These diverse personnel provide the DEA with an extensive breadth of experience and knowledge about illegal drug trafficking in the Western District of Pennsylvania in violation of Title 21, United States Code, Sections 841(a)(1) and 846. The information set forth below was obtained by me through my direct involvement in this investigation, as well as from information obtained from other agents and employees of the DEA.

4. Since June of 2012, the Drug Enforcement Administration (DEA) in conjunction with the Pennsylvania Attorney General's Office, Organized Crime Section have been involved in a criminal investigation of a large scale drug trafficking organization operating in Pittsburgh, PA. The investigation involves allegations of large-scale cocaine and marijuana trafficking, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

5. This Affidavit is submitted in support of a search warrant for one 2008 Kenworth T2000 tractor truck (black in color, bearing AZ Registration AE-68242) and a Dane refrigeration trailer (white in color bearing AZ Registration TB0433) previously occupied

by Joe Estarda AVITIA (hereafter **AVITIA'S TRACTOR and TRAILER**). **AVITIA'S TRACTOR** is registered to A and E Logistics, Inc. 605 West Lord Street, Tucson, AZ 85705 (the personal residence of AVITIA).

6. During the course of the investigation, as well as through the debriefing of confidential sources and Title III intercepts, information has been obtained that identifies that Joe Estarda AVITIA is a Tucson, Arizona based drug trafficker who is transporting loads of marijuana and cocaine to Philadelphia, Pennsylvania, Atlanta, Georgia and Pittsburgh, Pennsylvania areas. The target, Joe Estarda AVITIA is a CDL licensed cross-country truck driver who operates under the transportation company name of A and E Logistics Incorporated.

7. On February 26, 2011, Joe Estarda AVITIA, was stopped by the Oklahoma State Police in Oklahoma City, Oklahoma and $179,980.00 was seized from Joe Estarda AVITIA's tractor trailer.

8. On January 15, 2013, a DEA Confidential Source (hereinafter referred to as CS) received a phone call from Joe Estarda AVITIA. This CS has been corroborated on multiple occasions by your Affiant and has provided information that has and will lead to the arrest of multiple individuals located in the Western District of Pennsylvania and Arizona. The CS stated that AVITIA called the CS and stated that AVITIA wanted to meet with the CS in Pittsburgh, Pennsylvania but was unable to due to inclement weather. The CS and AVITIA discussed meeting with one another in

February of 2013 in Arizona.

9. On February 9, 2013, your Affiant was directed by the CS to AVITIA's residence in Tucson, AZ (605 West Lord Street, Tucson, AZ 85705). While on surveillance, your Affiant observed the **AVITIA TRACTOR AND TRAILER** parked in a vacant lot across the street from AVITIA's residence.

10. On February 12, 2013, the CS met with AVITIA in Casa Grande, Arizona. The CS stated that during this meeting, the CS and AVITIA discussed AVITIA transporting between 10-20 kilograms of cocaine to the CS in Pittsburgh, Pennsylvania. The CS stated that the CS agreed to pay AVITIA $34,000.00 for each kilogram of cocaine that AVITIA transports to the CS. During this meeting, AVITIA provided the CS with a second telephone number (520-576-7448) that the CS can use to contact AVITIA when discussing drug trafficking. The CS stated that AVITIA informed the CS that AVITIA conceals his illegal drug loads in the refrigeration unit that is located at the front of the trailer unit that AVITIA hauls. The CS stated that AVITIA also informed the CS that AVITIA conceals the drug proceeds for these shipments in a laundry detergent box that AVITIA keeps in the tractor portion of the tractor trailer unit.

11. On February 18, 2013, the CS received an incoming call from AVITIA and AVITIA advised the CS that AVITIA was going to be in the Pittsburgh, PA area the week of February 25th, 2013. The CS and AVITIA agreed to meet and have the CS show AVITIA the storage

facility where the CS was going to have AVITIA deliver the kilograms of cocaine to. The CS stated that AVITIA told the CS that AVITIA was going to be transporting a large amount of marijuana to the Philadelphia, Pennsylvania area and AVITIA would meet with the CS after the delivery.

12. On February 24, 2013, the CS received an incoming call from AVITIA who advised the CS that AVITIA would be in the Pittsburgh, Pennsylvania area on February 25, 2013. AVITIA told the CS that AVITIA had to make a delivery to the Philadelphia, Pennsylvania area first and then would be over to see the CS after the delivery was accomplished.

13. On February 25, 2013, at approximately 11:50 AM, the CS placed a call to AVITIA and this call went unanswered. At approximately 12:36 PM, the CS received an incoming call from AVITIA who called the CS from the drug-related cellular phone. AVITIA informed the CS that AVITIA had to stop last night and shut down due to unexpected police activity on AVITIA's route. AVITIA told the CS that AVITIA's arrival into Pittsburgh would have to be delayed due to trying to avoid detection by law enforcement. AVITIA informed the CS that AVITIA was in Pennsylvania and enroute to Philadelphia, Pennsylvania to drop off his load. AVITIA informed the CS that AVITIA would then be enroute to Pittsburgh, PA to meet with the CS on that afternoon of February 26, 2013.

14. On February 25, 2013, the Honorable Magistrate Judge Maureen P. Kelly seated in the Western District of Pennsylvania approved an order to disclose the location of Joe Estarda AVITIA's cellular phone (520-780-2335) that is docketed under 13-156M.

15. On February 26, 2013, at approximately 12:09 PM, electronic surveillance placed AVITIA's cellular phone in the Philadelphia, Pennsylvania area. At approximately 12:12 PM, the CS received a recorded telephone call to AVITIA. AVITIA informed the CS that AVITIA was still in the Philadelphia, PA area. AVITIA informed the CS that AVITIA was in possession of 800 pounds of marijuana that the Philadelphia based customers did not want. AVITIA informed the CS that AVITIA was going to be in enroute from Philadelphia, PA to Pittsburgh, PA to show the CS.

16. On February 27, 2013, the AVITIA TRACTOR and TRAILER were stopped by Pennsylvania State Police for a motor vehicle infraction in Somerset County, Pennsylvania. After speaking with a state trooper, AVITIA, who was driving the AVITIA TRACTOR AND TRAILER gave the state troopers consent to search the vehicle. Upon inspection the vehicle was observed to be carrying many large pallets of tomatoes. A trained drug detecting canine was then walked in the area of the vehicle and alerted for the presence of controlled substances contained within.

17. Based upon all of the foregoing information your affiant submits that there is probable cause to search eh AVITIA TRACTOR and TRAILER.

**EVIDENCE COMMONLY GENERATED BY DRUG-TRAFFICKING**

18. Your affiant is aware that in a substantial number of residential and vehicle searches executed in connection with drug investigations in which I and fellow drug agents/officers in the Western District of Pennsylvania have been involved, the following kinds of drug-related evidence typically have been recovered:

    a) controlled substances, including cocaine and marijuana;

    b) paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, stamp bags, ink pads and stampers, microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite, and vitamin B12;

    c) books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances or reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

    d) addresses and/or telephone books, rolodex, indices, and papers reflecting names, addresses, telephone numbers, pager

numbers, fax numbers, and/or telex numbers of co-conspirators and customers;

e) safes, money counting machinery, cash, currency, and records relating to controlled substances, income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, stocks, and bonds, as well as precious metals such as gold and silver, and precious gems such as diamonds - (this evidence often is located in a safe); as well as records relating to the sale, purchase and/or lease of automobiles, to include titles for all vehicles, and insurance records for all vehicles;

f) documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit cards receipts and telephone bills;

g) photographs, including still photos, negatives, video tapes, slides, films, undeveloped film and the contents therein, in particular photographs of co-conspirators and of assets;

h) computers, hard drives, cellular telephones, palm pilots, and/or other electronic media utilized for communication and data saving purposes, as well as documents relating thereto;

i) firearms and other dangerous weapons; and

j) identification evidence and/or indicia (such as cancelled mail, deeds, leases, rental agreements, photographs, bills, diaries, keys, and identification documents) which tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.

19. Based upon my training and experience, as well as the collective knowledge and experience of other agents and officers associated with this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory, drug related paraphernalia, and drug related records (as described above) in their residences and vehicles. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier(s) and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

20. It is also a generally common practice for drug

traffickers to conceal at their residences and inside their vehicles large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in their residences and vehicles.

21. Often, drug traffickers possess firearms, ammunition, and other dangerous weapons in their residences, businesses, and automobiles to protect their profits, drug supply, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs. Typically drug traffickers maintain possession of the firearms for extended periods of time.

22. Narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances; furthermore, I know that the aforementioned books, records, receipts, notes, ledgers, etc, are generally maintained where the traffickers have easy and ready access to them, including in their residences, businesses and automobiles.

23. Persons involved in significant drug trafficking typically conceal in their residences, businesses, and automobiles

large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money derived from narcotic trafficking activities. This type of evidence also often is located in a safe. I am aware that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances.

24. When drug traffickers amass proceeds from the sale of drugs, they often attempt to "legitimize" these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place expensive assets such as luxury vehicles in the names of other persons to conceal the true ownership and illegal source of the proceeds.

25. Narcotics traffickers often take or cause to be taken photographs of them, their associates, their property, and their product. These traffickers usually maintain these photographs in their residences and/or vehicles.

26. Drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement officers and, in so doing, acquire property, services, and personal identification (such as driver's licenses and birth certificates)

under their assumed or alias names, and they maintain such documents in evidence of their false identities in their residences, businesses, and automobiles, together with evidence of their true identities.

27. Drug traffickers commonly conceal their activities from members of the public by transacting their business in a covert manner and frequently by conducting their business during the nighttime hours when darkness helps to conceal their activities. In addition, large-scale drug traffickers often have multiple locations (including residences and/or "stash houses") from which they operate their illegal activities and in which they maintain evidence of said illegal activities. Finally, it has become common for sophisticated drug traffickers to utilize computers, cellular telephones, palm pilots, and/or other electronic media utilized for communication and data saving purposes, and evidence of their crimes often is found in the aforementioned electronic media.

28. Due to the illegal nature of their activities and the high risk of being "caught" by law enforcement, it is highly unusual for individuals primarily engaged in drug trafficking activities to associate regularly in their businesses or social activities with others not engaged in the same illegal drug trafficking activities.

29. Based on my training and experience, I know that powder drugs, such as cocaine and cocaine, are not manufactured or

cultivated within the Western District of Pennsylvania. "Source countries" for the manufacture and cultivation of cocaine include parts of Central and South America (for instance, Bolivia, Peru, Columbia, Guatemala, and Mexico, among others). Consequently, large-scale traffickers in powder drugs must themselves travel (or pay and arrange for others to travel on their behalf) to or from U.S. points of entry for the drugs (such as California, Florida, Arizona, etc.) and/or other major hubs of distribution in the United States such as New York City or Philadelphia. Such travel necessarily results in the generation of various travel documents for the traveler, which are typically kept in drug traffickers' residences and/or vehicles.

30. I know that powder drugs, such as cocaine, are generally brought into the Western Pennsylvania area in bulk and/or are pre-packaged. The cost of the cocaine is often the determining factor. The bulk form is of higher purity and often a preferred manner so as to make the most efficient use of space. However, such drugs are not consumed by users in such high purity form. Rather, such powder drugs, when ultimately consumed by the user, are at a lower purity level. High purity powder drugs are reduced in purity by the addition of dillutants such as mannitol, mannite, and vitamin B12. This process is called "cutting" or "stepping on" the drugs. Other equipment, such as scales, sifters, grinders, razor blades, glass panes, mirrors, and the like typically are used in this

cutting process. Once the drug has been "cut," a usual practice is to repackage it in smaller quantities for redistribution.

31. My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: a) my own involvement in prior drug investigations and searches during the course of my law enforcement career, as previously described; b) my involvement on numerous occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations; c) discussions with other members of DEA and/or other federal, state and local law enforcement officers, both about the facts of this case in particular and about trafficking in general; and d) other intelligence information provided through law enforcement channels.

## ITEMS TO BE SEIZED

32. Any and all items which constitute evidence, instrumentalities, or fruits of violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Section 1956(h), including:

    a) controlled substances, including cocaine and marijuana;

b) paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, stamp bags, ink pads and stampers, microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite, and vitamin B12;

c) books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances or reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

d) addresses and/or telephone books, rolodex, indices, and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers, and/or telex numbers of co-conspirators and customers;

e) safes, money counting machinery, cash, currency, and records relating to controlled substances, income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, check registers, stocks, and bonds, as well as precious metals such as gold and silver, and precious gems such as diamonds - (this evidence often is located in a safe); as well as records relating to the sale, purchase and/or lease of automobiles, to include titles for all vehicles, and insurance records for all

vehicles;

f) documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit cards receipts and telephone bills;

g) photographs, including still photos, negatives, video tapes, slides, films, undeveloped film and the contents therein, in particular photographs of co-conspirators and of assets;

h) computers, hard drives, cellular telephones, palm pilots, and/or other electronic media utilized for communication and data saving purposes, as well as documents relating thereto;

i) firearms and other dangerous weapons; and

j) identification evidence and/or indicia (such as cancelled mail, deeds, leases, rental agreements, photographs, bills, diaries, keys, and identification documents) which tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.

33. All of the above-listed items are evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846.

34. Further, your affiant requests permission to search any of the above-listed seized electronic media for additional evidence of these same violations.

WHEREFORE, for the foregoing reasons, your affiant has established that there exists probable cause to believe that AVITIA and his criminal associates are engaged in illegal cocaine and marijuana trafficking activities, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Further, your affiant believes that there is probable cause to search one 2008 Kenworth T2000 tractor truck (black in color, bearing AZ Registration AE-68242) and a Dane refrigeration trailer (white in color bearing AZ Registration TB0433)

The above information is true and correct to the best of my knowledge, information and belief.

BARRY BALDWIN
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Subscribed and sworn to before me this 27TH day of February, 2013.

HONORABLE LISA PUPO LENIHAN
UNITED STATES MAGISTRATE JUDGE